UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
Mtivity, Inc.

                Plaintiff,

     -against-

Office Depot, Inc. & John Does 1-35

              Defendants.

-----------------------------------------------x

**MEMORANDUM AND ORDER**

Case No. 1:19-cv-5094-FB-RML

*Appearances:*
*For the Plaintiff*:
DANIEL BERKO
Law Offices of Daniel Berko
819 Eddy St.
San Francisco, CA 94109

*For the Defendant*:
CHARLES CHEVALIER
Gibbons P.C.
1 Gateway Center
Newark, NJ 07102

**BLOCK, Senior District Judge:**

Plaintiff Mtivity, Inc. alleges that Defendant Office Depot, Inc. breached an

agreement to purchase and use its marketing software for a five-year term

("Agreement").[1] Mtivity further alleges that Office Depot violated the Defend

Trade Secrets Act of 2016 ("DTSA") by misappropriating and improperly

---

[1] The "John Doe" defendants are Office Depot employees alleged to have "aided
and abetted. . . in committing the acts and wrongs" alleged in the complaint. ECF
No. 13 at 2.

disclosing the details of its proprietary software to its new service provider, eLynxx Solutions ("eLynxx"). Mtivity seeks damages for breach of the Agreement, recovery in *quantum meruit* for services rendered under the Agreement, and damages for the unlawful disclosure of its trade secrets.[2]

Office Depot moves to dismiss Mtivity's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). It argues that (1) Mtivity's breach of contract claim is barred by the New York Statute of Frauds; (2) *quantum meruit* recovery is unwarranted because Office Depot paid the reasonable value of Mtivity's services; and (3) Mtivity's DTSA claim rests on conclusory allegations. For the reasons stated below, Office Depot's motion is granted in part.

## I. Factual Background

The following facts are taken from the amended complaint and the documents to which it refers. *See Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). For purposes of this motion, the Court accepts Mtivity's well-pleaded facts as true and draws all permissible inferences in its favor. *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 458 (2d Cir. 2019). Nothing in this section represents the Court's resolution of a disputed issue of fact.

---

[2] Mtivity has abandoned its claims for negligent misrepresentation and conversion, and Office Depot has consented in writing to their dismissal. ECF No. 18 at 7; ECF No. 20.

Mtivity is a global marketing technology firm. In April of 2016, Mtivity entered into a five-year agreement with Office Depot, which gave Office Depot and its employees a license to use Mtivity's proprietary software and access to support and hosting services.[3] In exchange, Office Depot paid an annual subscription fee, and both parties agreed not to disclose confidential information learned as a result of their business relationship.

The Agreement provides for a five-year term of service but allows the parties to terminate their arrangement early "by [mutual] written agreement." ECF No. 17, Ex. 2 at 11. It further provides that either party may terminate the Agreement if the other party fails to cure a breach, and that either party may terminate "for convenience" once the five-year term is complete if it gives "6 months written notice to the other party." *Id.* The confidentiality provisions remain in force even after the term of service and survive termination pursuant to the Agreement's termination clause. *Id.*

The Agreement states that it will be construed according to New York law. *Id.* at 15.

---

[3] The software "streamlines complex marketing processes." ECF No. 13 at 2. Mtivity developed the software over the course of 18 years and spent $18 million doing so. *Id.*

The parties never signed the Agreement. However, an unnamed Office Depot employee "represented to Mtivity that Office Depot would waive the right or need for Office Depot to sign the. . .Agreement [and stated] that Office Depot would adhere to the. . .Agreement the same as if it had signed the. . . Agreement." ECF No. 13 at 3. Relying on these representations—and in particular on Office Depot's alleged promise to use its software for five years—Mtivity agreed to lower the subscription price. Mtivity cut the price of its services by "at least $201,600" because it believed Office Depot would use its software for at least five years. Mtivity also spent a little over $100,000 to create and maintain the infrastructure needed to meet Office Depot's needs.

Office Depot paid the subscription price for all years in which it received services. It stopped paying for services when it switched to a new provider (eLynxx) after 2.5 years.

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).

### III.  Breach of Contract

### A.     The Agreement is Unenforceable under the Statute of Frauds

Office Depot argues that the Agreement is void under the New York Statute

of Frauds, which states:

> Every Agreement, promise or undertaking is void, unless it or some note or
> memorandum thereof be in writing, and subscribed [i.e. signed] by the party
> to be charged therewith. . . if such agreement. . . by its terms is not to be
> performed within one year from the making thereof. N.Y. Gen. Oblig. Law §
> 5-701.[4]

---

[4] The Court assumes that the parties have properly classed their Agreement as a
services contract governed by Gen. Oblig. Law § 5-701 *et seq.* rather than an
agreement for "general intangibles" governed by New York Uniform Commercial
Code § 1-201 *et seq.* (2015). *See* ECF No. 17, Ex. 2 at 4 ("This Agreement sets
forth the terms under which Office Depot may acquire and Mtivity will provide
Software, Hosting Services, Support and Maintenance, Training and Professional
Services"); *see also* ECF No. 13  at 2 (listing, in Mtivity's complaint, the "uses that
Office Depot has for Mtivity's services" and emphasizing that Mtivity's software
"is accessed rather than bought"); ECF No. 17, Ex. 1 at 9 (stating, in Office
Depot's brief, "that the parties drafted a service agreement"). Because the parties
appear to agree that the Agreement is properly analyzed under the General
Obligations Law, and the caselaw distinguishing software service contracts from
contracts for "digital intangibles" is far from clear, the Court will not disturb the
parties' consensus. *See Arbitron, Inc. v. Tralyn Broadcasting, Inc.*, 400 F.3d 130,
138 n.2 (2d Cir. 2005) (noting that "it is not clear that licensing agreements—be
they for the right to use software, or data. . . are contracts for the sale of goods")
*but see Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 431 (2d Cir.
1995) (defining "general intangibles" to include various intellectual property
rights).

Specifically, Office Depot contends that the Agreement is void under the plain language of the statute because it contemplates a five-year term and is unsigned. Mtivity responds that the Statute of Frauds does not apply because the parties can theoretically "fully perform" the Agreement in less than a year if they invoke the mutual termination clause, and the Statute of Frauds invalidates "only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year." *Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007); *see also BPP Wealth, Inc. v. Weiser Capital Mgmt., LLC*, 623 F. App'x 7, 12-3 (2d Cir. 2015) (noting that "[m]ost agreements terminable at will are not subject to the Statute of Frauds because performance could be completed in less than one year if either party were to exercise its termination option").

## 1. The Mutual Termination Clause is not a Nullity

As a preliminary matter, the Court rejects Office Depot's argument that "logic" renders the mutual termination clause a legal nullity because, "[as] a practical matter, any contract can be cancelled at any time by mutual assent of the parties." ECF No. 17, Ex. 1 at 13. While this statement is usually true, it ceases to be true "under New York law," where,  as here, "the parties agree that a written contract can be terminated on written notice." *Bulldog New York, LLC v. Pepsico, Inc. et al.*, 8 F. Supp. 3d 152, 167 (D. Conn. 2014) (citing *Israel v. Chabra*, 12 N.Y.3d 158, 878 N.Y.S.2d 646, 906 N.E.2d 374, 379 (2009)). In such a situation,

the parties' consent is only effective if they execute another "writing signed by the party against whom the termination. . . is sought to be enforced," a requirement that may not be satisfied "at any time" by an act of will. *Id.*

Moreover, the legal effects of a common law "recission by abandonment" and termination pursuant to a termination clause are subtly different. Under New York law, "assent to abandonment *dissolves the contract* so that a [a party] can neither sue for a breach nor compel specific performance," whereas termination pursuant to a termination clause is usually treated as alternate performance. *EMF Gen. Contracting Corp. v. Brisbee*, 6 A.D.3d 45, 774 N.Y.S. 39, 43 (1st Dept. 2004) (emphasis added); *see also Blake v. Voight*, 134 N.Y. 69, 72, 31 N.E. 256 (1892) (holding that invoking termination clause "advanced the period of fulfillment"). This distinction is significant because certain clauses of the Agreement are intended to endure even after performance is complete. *See* ECF No. 17, Ex. 2 at 11 (listing sections of the Agreement that survive termination). These clauses would be rendered null and void if the parties "dissolve" the contract by common law abandonment but, per the Agreement's terms, would not be affected by termination pursuant to the mutual termination clause. *Brisbee*, 774 N.Y.S., at 43. The Court therefore rejects Office Depot's argument that the mutual termination clause is a legal nullity with no relevance to the Agreement's construction. Instead, it reaches a novel and important question of state law: Does

the inclusion of a "mutual termination clause" in a contract transform that contract

into one that can be performed in a year or less?

## 2. The Mutual Termination Clause does not Remove the Agreement from the Statute of Frauds

When determining the "length" of a contract for Statute of Frauds purposes,

New York courts distinguish between termination clauses triggered by events

outside the parties' control, and those triggered by events within their control. The

first type of termination clause usually will *not* exempt an agreement from the

Statute of Frauds, while the latter will. *Compare Radio Corp. of Am. v. Cable*

*Radio Tube Corp.*, 66 F.2d 778, 785 (2d Cir. 1933) (concluding that options to

terminate in case of "breach, bankruptcy, insolvency or the appointment of a

receiver" do not exempt a contract from the Statute of Frauds because they are

"contingencies over which [the parties] had no control") *and Dundee Wine and*

*Spirits, Ltd. v. Glenmore Distilleries Co.*, 238 F.Supp. 283, 288 (E.D.N.Y. 1965)

(holding that termination based on "outside circumstances and the will of a third

party" did not exempt a contract from the Statute of Frauds) *with North Shore*

*Bottling Co. v. C. Schmidt & Sons Inc.*, 22 N.Y. 2d 171, 177, 239 N.E. 2d 189

(1968) (concluding that an agreement was not subject to Statute of Frauds where

"an action. . . unquestionably within the defendant's power to take" would

terminate it before a year had elapsed) *and Voight*, 134 N.Y., at 72 (holding that

the statute of frauds did not apply to a contract that either party could terminate

after seven months because invoking the termination provision "did not defeat the contract, but simply advanced the period of fulfillment"); *see also Jillcy Film Enterprises, Inc. v. Home Box Office, Inc.*, 593 F. Supp. 515, 518-21 (S.D.N.Y. 1984) (collecting cases on both sides of the divide).

A contract terminable by *mutual written agreement* does not, however, fit neatly in either category. On the one hand, the parties unquestionably have the power to invoke the provision, so termination pursuant to the provision is not a contingency over which they collectively "have no control." *Cf. Cable Radio Tube Corp.*, 66 F.2d, at 785.  However, in the event that one of the parties does not wish to invoke the provision, the "will" of that party becomes a "circumstance over which [the other party] has no control," so the power to invoke the provision is not "unquestionably within the [invoking party's] power." *Id.*; *C. Schmidt & Sons Inc.*, 22 N.Y. 2d at 177. Considering this tension, it is hardly surprising that the few courts to consider the impact of mutual termination provisions on the Statute of Frauds have come to opposite conclusions. *Compare Scheuer v. Monash*, 40 Misc. 668, 670, 83 N.Y.S. 253 (Sup. Ct. App. Term 1903) (holding that "when the parties mutually terminate a contract of employment before the expiration of its term, the said contract becomes fully executed, notwithstanding it has. . . a longer period to run") *with Revson v. Claire's Stores, Inc.*, 120 F. Supp. 2d 322, 324 (S.D.N.Y. 2000) ("Termination by. . . mutual consent is not performance").

This tension is for state—not federal—courts to resolve. However, the Court believes the circumstances of this case warrant application of the Statute of Frauds. As a practical matter, mutual termination clauses give disproportionate power to a party who opposes termination, who may decide whether an Agreement lasts less than one year (such that it would fall within the Statute of Frauds) or longer (such that it would be exempt from the statute). If the Court were to hold that such clauses exempt agreements from the Statute of Frauds, it would necessarily accept Mtivity's position that a party can be forced to perform a contract for five years merely because the other party's consent would have enabled it to perform in less than year. This is an absurd result, which is in tension with New York state decisions deeming the Statute of Frauds applicable to contracts where "performance within one year depends on an act solely within the control of the party seeking to enforce [an]. . . agreement." *Zaitsev v. Salomon Bros., Inc.*, 60 F.3d 1001, 1003 (2d Cir. 1995) (citing *Sawyer v. Sicklinger*, 47 A.D. 2d 291, 294, 366 N.Y.S.2d 435, 438 (1st Dept. 1975)).

The Agreement is therefore not exempt from the Statute of Frauds.

**B.    The Doctrine of Equitable Estoppel does not Remove the Agreement from the Statute of Frauds**

Mtivity next argues that "Office Depot is estopped from asserting any defense to the contract based on [the Statute of Frauds] because Office Depot's officers and agents, including its Senior Director, told Mtivity that Office Depot

would treat the [Agreement] as signed, and that a signature was unnecessary to bind Office Depot." ECF No. 13 at 5. Although Mtivity's brief is not entirely clear on the point, the Court construes this statement as an attempt to invoke the Doctrine of Equitable Estoppel.

"To establish a claim for equitable estoppel under New York law, a party must show (1) an act constituting a concealment of facts or false representation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; and (4) reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment." *Nasso v. Bio Reference Labs, Inc.*, 892 F. Supp. 2d 439, 449 (E.D.N.Y. 2012) (citing *Gen. Elec. Capital Corp. v. Eva Armadora S.A.*, 37 F.3d 41, 45 (2d Cir. 1994)). Because "equitable estoppel is an extraordinary remedy . . . . [and] the statute of frauds is not easily avoided," the burden of proof "weighs heavily" on a party seeking to prevent assertion of a Statute of Frauds defense. *Id.* (internal citations and quotations omitted). Moreover, New York courts will not allow a party to invoke estoppel unless that party has suffered "unconscionable injury and loss." *Am. Bartenders Sch., Inc. v. 105 Madison Co.*, 59 N.Y.2d 716, 718, 463 N.Y.S. 2d 424, 450 N.E.2d 230 (1983); *see also Croce v. Hirsch*, 88 Civ. 8514 (KMW), 1991 WL 95397 (S.D.N.Y. May 28, 1991) (applying "unconscionable injury" standard).

The Court finds Mtivity has adequately pled the first three elements of equitable estoppel. Although the Court is troubled by Mtivity's failure to directly allege that Office Depot's Senior Director had knowledge of his company's supposed intent to disregard the Agreement,[5] the Court will not foreclose the possibility that Mtivity can prove constructive knowledge at a later stage of litigation. *See Special Event Entertainment v. Rockefeller Ctr., Inc.,* 458 F. Supp. 72, 77 (S.D.N.Y. 1978) (giving liberal construction to equitable estoppel argument at the motion to dismiss stage). There is no dispute that the Director's statement ultimately proved to be false, and the Court accepts Mtivity's allegations regarding its reliance.

Nonetheless, not even the most liberal construction can transform the harm Mtivity allegedly suffered into the sort of "unconscionable injury and loss" that would support application of equitable estoppel. In the complaint, Mtivity alleges that it suffered "$625,000 or more in damages being lost profits from Office Depot's breach of the [Agreement]." ECF No. 13 at 5. Because these damages are

---

[5] Until recently, the Complaint described the Senior Director's statement as a "Negligent Misrepresentation," and it never included a claim against the Director for intentional fraud. ECF No. 13 at 6. Thus, while the Complaint clearly alleges that the Senior Director "should have known" the true facts, it has never stated that he actually had such knowledge. *See generally Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000) (defining "Negligent Misrepresentation" as a "representation that [the defendant] should have known was incorrect").

12

"lost profits" that Mtivity intended to reap from the Agreement, they are expectation damages, and expectation damages are not available as equitable relief.[6] *See Merex A.G. v. Fairchild Weston Systems, Inc.*, 29 F.3d 821, 825-26 (2d Cir. 1994). Rather, "to invoke the power that equity possesses to trump the Statute of Frauds, [a] plaintiff must demonstrate unconscionable injury, i.e. injury beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement." *Id.*; *see also Wolet Capital Corp. v. Walmart, Inc.*, 18-CV-12380 (LJL), 2021 WL 242297, at * 13 (S.D.N.Y. Jan. 25, 2021) (collecting cases in support of the proposition that "courts have consistently rejected promissory estoppel claims when the alleged injury consists of lost profits, lost fees, foregone business opportunities or damage to business reputation"). Mtivity alleges no such extraordinary injury here, so equitable estoppel is unavailable.

## C.   The Doctrine of Partial Performance does not Remove the Agreement from the Statute of Frauds

Finally, the Court rejects Mtivity's attempt to invoke the Doctrine of Partial Performance. Like the "closely related" Doctrine of Equitable Estoppel, the

---

[6] "Lost profits" can also be consequential damages if they would have been realized in a "collateral" venture. For example, Mtivity's damages would be consequential if Office Depot's nonperformance caused it to be unable to pursue some other course of business. *See LG Capital Funding, LLC v. Accelera Innovations, Inc.*, 17-CV-1460-DLI-ST, 2018 WL 5456670, at *10 (E.D.N.Y. Aug. 13, 2018). However, because the "lost profits" in this case were to be derived directly from the Agreement, they are expectation damages.

Doctrine of Partial Performance permits a party to remove an agreement from the scope of the Statute of Frauds. *Margate Indus., Inc. v. Samincorp, Inc.*, 582 F. Supp. 611, 619 n.8 (S.D.N.Y. 1984). To invoke the Doctrine of Partial Performance, a plaintiff must show: (1) that the defendant made a fraudulent promise or misrepresentation; (2) upon which the plaintiff justifiably relied; (3) by engaging in an act "unequivocally referrable" to the fraudulent promise; (4) resulting in "substantial injury." *Id.* at 618 (internal quotations and citations omitted). Mtivity's attempt to invoke the Doctrine fails for two reasons.

## 1. The Doctrine is Unavailable Under New York Law

New York courts are split on the question of whether the Doctrine of Partial Performance can remove an Agreement from the specific Statute of Frauds invoked in this case, which is codified at N.Y. Gen. Oblig. Law § 5-701. *See MSL Productions, Inc. v. IMR Group, LLC*, 41 Misc. 3d 649, 651-54, 971 N.Y.S.2d 192 (Sup. Ct. 2013) (describing split among the appellate divisions). The Third and Fourth Departments' Appellate Divisions have stated that partial performance operates to remove a contract from the scope of the Statute of Frauds codified at N.Y. Gen. Oblig. Law § 5-703 (which governs real estate transactions) but does not extend to agreements under N.Y. Gen. Oblig. Law § 5-701. *See, e.g.*, *Am. Tower Asset Sub, LLC v. Buffalo-Lake Erie Wireless Sys, Co.*, 104 A.D.3d 1212, 961 N.Y.S. 2d 667 (4th Dept. 2013); *Valentino v. Davis*, 270 A.D.2d 635, 637, 703

N.Y.S. 2d 609 (3d Dept. 2000). By contrast, the Second Department has applied the Doctrine to agreements under N.Y. Gen. Oblig. Law § 5-701. *See EDP Hosp. Computer Sys., Inc. v. Bronx-Lebanon Hosp. Ctr*, 13 A.D.3d 476, 477-78, 789 N.Y.S. 2d 50 (2d Dept. 2004). Finally, the First Department has split internally on the question. *Compare Stephen Pevner, Inc. v. Ensler*, 309 A.D.2d 722, 766, N.Y.S. 2d 183 (1st Dept. 2003) (partial performance exception "has not been extended" to N.Y. Gen. Oblig. Law § 5-701) *with Carey & Assocs. v. Ernst*, 27 A.D.3d 261, 810 N.Y.S. 2d 475 (1st Dept. 2006) (reaching merits of part performance argument) *and Travis v. Fallani and Cohn*, 292 A.D.2d 242, 739 N.Y.S.2d 675 (1st Dept. 2002) (exempting agreement from N.Y. Gen. Oblig. Law § 5-701's statute of frauds based on claim of partial performance).

The Court of Appeals has yet to resolve this split in authority. Although this Court lacks the power to refer contested questions of state law to the Court of Appeals, it may "predict how the forum state's highest court would decide" an ambiguous question of state law and rule accordingly. *McCarthy v. Olin Corp.*, 119 F.3d 148, 154 (2d Cir. 1997). Thus, having considered the parties' arguments, the Court "predicts" that the Court of Appeals would hold that the Doctrine of Partial Performance is not an exception to the statute of frauds codified at N.Y. Gen. Oblig. Law § 5-701. This prediction rests on dicta contained in the Court of Appeals decision: *Messner Vetere Berger McNamee Schmetterer Euro RSCG, Inc.*

15

*v. Aegis Group, PLC*, 93 N.Y.2d 229, 235, 711 N.E.2d 953 (1999). In *Aegis*

*Group*, the Court of Appeals corrected the Second Circuit's statement that "[the

Court of Appeals] has recognized a parallel judicially-created part performance

exception to [N.Y. Gen. Oblig. Law] § 5-701" and clarified that "[it had] not in

fact adopted that proposition." *Id.* at 235 n.1. This statement is a clear signal that

the Court of Appeals does not favor expanding the Doctrine of Partial Performance

to cover agreements under N.Y. Gen. Oblig. Law § 5-701, which Mtivity fails to

meaningfully rebut.

The Court therefore holds that the Doctrine of Partial Performance does not

exempt the Agreement from N.Y. Gen. Oblig. Law § 5-701's statute of frauds.

**2.    Even if the Doctrine is Available, Mtivity fails to plead partial performance**

Alternatively, the Court does not believe that Mtivity has adequately pled

the elements of partial performance. Like the Doctrine of Equitable Estoppel, the

Doctrine of Partial Performance is an equitable doctrine designed to prevent fraud.

*See Woolley v. Stewart,* 222 N.Y. 347, 351, 118 N.E. 847 (1918). Because of this

similarity, the Second Circuit has equated "substantial injury" under the Doctrine

of Partial Performance with "unconscionable injury" under the Doctrine of

Equitable Estoppel on at least one occasion. *See Philo Smith & Co, Inc. v. USLIFE*

*Corp.*, 554 F.2d 34, 36 (2d Cir. 1977) (noting that "[the] relatively limited scope of

the doctrine [of partial performance] is nowhere more evident than in its

16

requirement of substantial injury," and holding that the plaintiff's alleged "substantial injury" did not "generate a sufficient level of unconscionability to. . . warrant application of the doctrine [of partial performance]"). Accordingly, the Court finds that Mtivity fails to plead "substantial injury" for essentially the same reasons it fails to plead "unconscionable injury."

Finally, even if none of the preceding reasons for dismissal applied, the complaint could not proceed in its current form because Mtivity improperly seeks "legal" relief (damages) on an equitable theory of relief. *See* ECF No. 18 at 15 (acknowledging inappropriate demand for damages based on the Doctrine of Partial Performance). The Court agrees with Mtivity that this improper demand is not a ground for dismissal with prejudice. *See Burkina Wear, Inc. v. Campagnolo S.R.L.*, 07 CIV 3610, 2008 WL 1007634, at *3 (S.D.N.Y. Apr. 9, 2008) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 131 (1983) (Marshall, J. dissenting) (holding that "the question whether a plaintiff has stated a claim turns not on whether he has asked for the proper remedy but whether he is entitled to any remedy"). However, Mtivity's failure to seek proper relief would require it to amend its complaint even if the Second Circuit reverses this Court's dismissal.[7]

---

[7] The Court acknowledges Office Depot's Reply argument that specific performance is unavailable in this case. *See* ECF No. 19 at 9. Because Mtivity's breach of contract claim is subject to dismissal for several other reasons, the Court does not address this argument.

# IV. *Quantum Meruit*

Mtivity also seeks damages on a quasi-contract theory of *quantum meruit* or unjust enrichment. "[To] recover in *quantum meruit*, New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) (citing *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994)).

The parties do not dispute the presence of the first three elements. However, Office Depot argues that the *quantum meruit* count must be dismissed because it has paid for all services rendered, and Mtivity fails to allege the "reasonable value" of its services. Neither of these arguments warrants dismissal. As to the first, Office Depot's payment of the price stated in the Agreement does not conclusively establish that it paid "reasonable value," because "under New York law, a contract that is unenforceable under the Statute of Frauds is inadmissible as evidence of the reasonable value of services." *Id.* Thus, the question of "reasonable value" remains for the Court to decide.

The second argument fails because Mtivity has alleged the "reasonable value" of its services. Although Office Depot is correct that Mtivity's complaint does not list a single number labelled "reasonable value of services," the complaint

states that the difference between the amount it received for its services and the

amount it would have charged was "at least $201,600." ECF No. 13 at 6. Thus,

drawing all inferences in Mtivity's favor, the Court finds that the "reasonable

value" of Mtivity's services is alleged to be the price Office Depot has already paid

plus "at least $201,600." Of course, these allegations are not *proof* of the value of

Mtivity's services—and Mtivity will be required to identify and argue the relevant

legal standards in order to recover—but its allegations are sufficient to allow the

case to proceed to summary judgment on the issue of whether Office Depot has

paid the "reasonable value" of Mtivity's services.

### V. DTSA Violation

Mtivity alleges that Office Depot violated the DTSA by disclosing the

details of its proprietary software to non-party eLynxx Solutions.

The DTSA creates a cause of action for misappropriation of a "trade secret."

*Kairam v. West Side GI, LLC*, 793 F. App'x 23, 27 (2d Cir. 2019) (citing 18 U.S.C.

§ 1836(b)). "The statute defines a 'trade secret' to include all forms and types of

financial, business, scientific, technical, economic or engineering information,

including. . . methods, techniques, processes, procedures and programs." *Id.*

However, information is not a "trade secret" under the DTSA unless

> the owner [of the information] has taken reasonable measures to keep [the]
> information secret; and. . . the information derives independent economic
> value, actual or potential, from not being generally known to, and not being
> readily ascertained by proper means by, another person who can obtain

economic value from the disclosure or use of the information. *Id.* at 28 (citing 18 U.S.C. § 1839(3)).

 "Misappropriation" means "acquisition of a trade secret by a person who know or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who. . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5). Finally, the term "improper means" encompasses acquisition by "theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy or espionage." 18 U.S.C. § 1839(6).

Office Depot argues that Mtivity's software is not a trade secret, that its DTSA claim has not been pled with the required level of specificity, and that Mtivity fails to allege a proper type of damages. With regard to the second point, it points out that "Mtivity fails to provide any details regarding **what** about Mtivity's software is 'innovative and contains unique proprietary features' or **how** 'Mtivity closely guards and protects its proprietary software and web platform.'" ECF No. 19 at 14 (bold emphasis in original). Mtivity responds that Office Depot's critiques of its complaint raise issues of fact that should not be decided on a motion to dismiss. ECF No. 18 at 19 (collecting cases in support of the proposition that "the issue of whether a trade secret exists is a question of fact").

**A.     Mtivity has Pled the Existence of a "Trade Secret"**

As a preliminary matter, the Court finds that Mtivity has adequately alleged that its software is a "trade secret." Although the Second Circuit has not created a definitive test for what constitutes a trade secret under the DTSA, courts in the circuit have looked to a non-exclusive list of factors used to identify trade secrets under similar state laws. *see Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (noting that New York law on trade secrets is "fundamentally the same" as the DTSA). Those non-exclusive factors are:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990).

Mtivity's complaint does not speak to all of these factors, but it does mention that the company spent over $18 million and 18 years of labor on research and development, which is sufficient to place the fourth and fifth factors in its column. ECF No. 13 at 2. Moreover, the Court's review of the judicially noticeable Agreement, which contains a lengthy confidentiality clause explicitly designed to survive termination, suggests that Mtivity takes measures to preserve the secrecy of its information. ECF No. 17, Ex. 2 at 10-11; *see also Syntel Sterling Best Shores Mauritius, Ltd. v. Trizetto Grp, Inc.*, 15-CV-211 (LGS) (RLE), 2016 WL 5338550,

at *6 (S.D.N.Y. Sept. 23, 2016) (deeming allegation that "defendants. . .have taken

reasonable measures to keep the information secret by making those who use it

subject to confidentiality provisions and limitations" sufficient in context of DTSA

claim). These facts and allegations, in conjunction with Mtivity's generic assertion

that it "closely guards" its proprietary software, establish that the software contains

or is itself a "trade secret" for purposes of the instant motion to dismiss. *See* ECF

No. 13 at 2.

**B.     Mtivity's DTSA Claim is Sufficiently Specific**

Mtivity has also adequately pled the remaining elements of a DTSA

violation. Office Depot's argument to the contrary appears to rest on the premise

that DTSA claims are subject to heightened pleading standards, but several district

courts that have held that "there is no heightened pleading standard for claims

brought under the DTSA." *See, e.g.*, *Iacovacci*, 437 F. Supp. 3d, at 380 (quoting

*Tesla Wall Sys., LLC v. Related Cos. LLP*, No. 17-CV-5966 (JSR), 2017 WL

6507110, at *10 (S.D.N.Y. Dec. 18, 2017)); *Chubb Ina Holdings, Inc. v. Chang*,

No. 16 Civ.  2354 (BRM) (DEA), 2017 WL 499682, at *10 (D.N.J. Feb. 7, 2017);

*Cf.* ECF No. 19 at 12 (arguing that "Mtivity's alleged Trade Secret Claim does not

meet the heightened pleading requirements of the DTSA"). Absent some argument

from Office Depot, the Court declines to impose a heightened pleading standard on

DTSA claims. Rather, the Court must allow Mtivity's claim to proceed so long as

it is "pled with sufficient specificity to inform [Office Depot] of what [it] has misappropriated." *Medidata Sol, Inc. v. Veeva Sys., Inc.*, 17 Civ. 589 (LGS), 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018).

Mtivity's complaint satisfies this lesser standard. The complaint states that Office Depot gave Mtivity's competitor access to proprietary software, thereby allowing that competitor to "access. . . Mtivity's application[,]. . .view almost every page of Mtivity's application and . . .access Mtivity's data." ECF No. 13 at 3. Thus, the complaint makes clear that the trade secret infringed is the structure and design of Mtivity's program, as well as the structure of its servers and the data they contain. Despite its occasionally vague language, the complaint is sufficient to put Office Depot on notice that it is alleged to have permitted the unauthorized inspection of proprietary software that Mtivity considers a "trade secret."

## C.   Remedy

Finally, Office Depot argues that Mtivity has failed to allege damages recoverable under the DTSA. The DTSA empowers the Court to enter an injunction to prevent further misappropriation of a trade secret and to award damages for "actual loss caused by misappropriation of the trade secret," "unjust enrichment caused by the misappropriation that is not addressed in computing the damages for actual loss" or, "in lieu of other damages[,]. . . a reasonable royalty for the. . .unauthorized disclosure or use." 18 U.S.C. § 1836(b)(3)(B); *see also Chadha*

*v. Chadha*, 16-CV-3739 (ENV) (AKT), 2020 WL 1031385, at \*7 (E.D.N.Y. Mar. 2, 2020) *adopted by* 2020 WL 5228812. It does not, however, provide for the type of damages Mtivity seeks, i.e. "damages based on the cost to create the application, the cost for data migration and employee costs." ECF No. 18 at 20. Because these types of damages are not explicitly covered by the statute, and it is unclear how the alleged improper disclosure caused Mtivity to incur them, Mtivity has failed to plead a cognizable harm.

Nonetheless, the Court will not order dismissal with prejudice based on a potentially corrigible pleading defect. The "question whether a plaintiff has stated a claim turns not on whether he has asked for the proper remedy but whether he is entitled to any remedy." *Campagnolo S.R.L.*, 07 CIV 3610, 2008 WL 1007634, at \*3;  *see also West Side GI, LLC*, 793 F. App'x, at 28 (dismissing without prejudice in DTSA case where dismissal was based on the plaintiff's "failure to plead a necessary element of the claim or to provide necessary details to support a claim").

## CONCLUSION

Office Depot's motion is **DENIED** as to Mtivity's *quantum meruit* claim but **GRANTED** as to all other claims. Count I of Mtivity's complaint is **DISMISSED WITH PREJUDICE,** and Counts III, IV and V are **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED.**


_/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge




Brooklyn, New York
March 16, 2021